IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| NIBCO Inc., | : | Case No. 1:15-cv-062 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | Order Denying Plaintiff's Motion for |
| | : | Summary Judgment and Granting |
| City of Lebanon, Ohio, | : | Defendant's Motion for Summary |
| | : | Judgment |
| Defendant. | : | |

This matter is before the Court on cross-Motions for Summary Judgment. At issue is whether Plaintiff NIBCO Inc. is responsible to pay Defendant City of Lebanon, Ohio undercharges in the amount of $1,269,993 from electric utility bills issued by the City of Lebanon to NIBCO over a period of sixty-five months. For the reasons that follow, the Court will **DENY** NIBCO's Motion for Summary Judgment (Doc. 17) and **GRANT** the City of Lebanon's Motion for Summary Judgment (Doc. 19).

I.     **BACKGROUND**

A.     **Factual History**

These facts are derived, except where specifically noted otherwise, from the parties' Statements of Proposed Undisputed Facts (Docs. 17-1and 19-1) and the Responses (Docs. 20-1 and 21-1) thereto.

The City of Lebanon is a duly organized and existing Ohio municipal corporation. It provides utility services to its commercial and residential citizens. When the City of Lebanon establishes a new electric account, a representative from the Department of Service inputs certain account holder information into the billing software, including a billing address and metering information. One of these inputs is a "meter multiplier." In simple terms, a meter multiplier

represents a current transformer ratio and is based on the size of the electric service needed for a particular facility.  A meter multiplier is common for large power consumers.  It helps to ensure that the meter does not exceed its capability.  The meter multiplier is entered directly into the City of Lebanon's billing software system, which automatically applies the multiplier to a customer's monthly meter reading to measure actual electric consumption.  Shawn Coffey, the director for electric operations for the City of Lebanon, testified that a meter multiplier is not something "that most customers understand or have been exposed to."  (Doc. 16-1 at PageID 809.)

NIBCO is a privately held Indiana corporation that manufactures flow control products, pipe fittings, and valves for the distribution of water and other liquids.  In 2008, NIBCO had two Ohio facilities located in close geographic proximity performing related functions, one at 2775 Henkle Drive in the City of Lebanon and the other in Franklin, Ohio.  Near the end of 2008, NIBCO moved its Lebanon facility across the street to 2800 Henkle Drive in Lebanon and consolidated the Franklin facility operations into the new Lebanon facility.

NIBCO submitted an Application for Utility Services to the City of Lebanon for the 2800 Henkle Drive facility on or about September 18, 2008.  The City of Lebanon accepted the application and established service for the new facility.  NIBCO agreed in the application to "be responsible for payment of all bills lawfully due with respect to the above requested services until notification to discontinue service."  (Doc. 1-5 at PageID 26.)  NIBCO began operations at the new facility in January 2009.  Electricity usage had a ramping up period in early 2009, then stabilized and remained fairly consistent from year-to-year.

The City of Lebanon installed a new utility meter at the NIBCO facility and established a new utility account for NIBCO.  The meter itself functioned properly.  However, a Lebanon

customer service representative entered an incorrect meter multiplier with a value of 40 into the billing software system for the new NIBCO account. Instead, the meter multiplier for the NIBCO account should have had a value of 400. Based on the erroneous meter multiplier in the billing system, the City of Lebanon undercharged NIBCO for its electric usage from January 2009 until June 2014 as follows:

| YEAR | ACTUAL BILLED | CORRECT BILLING AMOUNT | ANNUAL UNDER-BILLED AMOUNT |
|---|---|---|---|
| 2007 | $135,502 | --- | $0 |
| 2008 | $194,263 | --- | $0 |
| 2009 | $ 27,655 | $260,799 | $233,144 |
| 2010 | $ 30,231 | $270,924 | $240,692 |
| 2011 | $ 29,861 | $266,381 | $236,520 |
| 2012 | $ 29,797 | $267,605 | $237,807 |
| 2013 | $ 28,848 | $261,291 | $232,443 |
| 2014 | $ 11,152 | $100,540 | $ 89,387 |
| | | TOTAL: | **$1,269,993** |

(Doc. 14-4 at PageID 643.)

Neither NIBCO nor the City of Lebanon noticed the error until June 2014. The City of Lebanon re-set the meter multiplier to 400 in its billing system at that time so that the error did not recur in subsequent monthly billing statements. NIBCO has paid all current charges calculated with the corrected meter multiplier.

George Pat Clements, the city manager for the City of Lebanon, testified that Lebanon uses a "power cost adjustment" as a factor in its electric rates that allows the City to adjust rates based on its wholesale cost of power and demand for electric service from the utility customers. (Doc. 15-1 at PageID 700–01.) He testified that the lost revenue created by the underbilling of NIBCO was absorbed mathematically into the power cost adjustment and spread out in charges to the City of Lebanon's approximately 9,200 other customers. (*Id.* at 701–03.) He further testified that if the City of Lebanon recoups the $1,269,993 from NIBCO, then that revenue

collected "would lower, it would really create a mathematical credit, to some degree, to the 9,200 customers." (*Id.* at PageID 704.)

In a letter dated August 21, 2014, the City of Lebanon informed NIBCO of its intention to recoup the undercharges over a period of sixty-five months going forward:

> The purpose of this letter is to inform NIBCO beginning January 1, 2015, the City is required to bill NIBCO for the balance of $1,269,993 of electric service used by NIBCO, and that the City will allow NIBCO the same 65 month period to pay the undercharge as it took the undercharge to be accumulated. Based on the City's recalculation of each of the 65 electric bills affected, NIBCO will be billed an additional amount of $19,538.35 each billing cycle over the 65 month period, as part of NIBCO's monthly utility bill. Since the clerical error was the City's responsibility, and NIBCO did not notice the error, no interest or penalties shall be imposed on NIBCO. NIBCO will pay only for electric service that NIBCO clearly used during the relevant time period.

(Doc. 1-6 at PageID 28.) The City of Lebanon issued NIBCO a monthly utility bill on December 30, 2014 that included the undercharge recoupment amount of $19,538.35.

**B.      Procedural Posture**

NIBCO filed a Complaint for Declaratory Judgment and Preliminary Injunction (Doc. 1) against the City of Lebanon on January 29, 2015. NIBCO asks the Court to declare that it has no obligation to pay undercharges in the amount of $1,269,933. The City filed an Answer (Doc. 6) requesting that judgment be issued in its favor. The Court then entered an Agreed Order (Doc. 7) prohibiting the City of Lebanon from disconnecting NIBCO's utilities during the pendency of the lawsuit based on NIBCO's failure to pay the amounts associated with the undercharge recoupment.

The parties now have filed the pending summary judgment motions following a period of discovery. The Court held oral argument on the motions at the request of NIBCO on March 17, 2016.

**II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811. A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–01 (B.A.P. 6th Cir. 2007).

**III.    ANALYSIS**

The issue before the Court is whether the City of Lebanon has the authority to collect from NIBCO $1,269,993 in undercharges incurred for electric services provided to NIBCO from January 2009 to June 2014.

The Ohio Constitution authorizes municipalities like the City of Lebanon to own and operate public utilities the service of which "is supplied or is to be supplied to the municipality or its residents." Ohio Const. Art. XVIII § 4. The parties agree that the City of Lebanon's electric utility is exempt from Ohio statutes governing public utilities and from regulation by the

5

Public Utilities Commission of Ohio ("PUCO"). Instead, the electric utility is governed by Chapter 910 of the City of Lebanon's Code of Ordinances. "The terms under which the services of a municipally owned public utility are sold to residents of the municipality are established by municipal ordinance." *Xenia v. Ohio*, 140 Ohio App. 3d 65, 746 N.E.2d 666, 670 (2000).

The parties cite to several provisions of Chapter 910, but they agree that none of the provisions in effect during the relevant time period are dispositive of the particular issue before the Court. Section 910.01(C) stated that when a customer's "application for service is accepted" by the City of Lebanon, the "application becomes a contract between the applicant/customer and the [C]ity." Section 910.03(A) created a duty for the City to read or estimate service meters approximately one time per month. Section 910.04 required the City to "compute the proper charge to be billed to the consumer" after the meter is read. Section 910.05(A) provided that each bill to the customer "shall include the charges due for all products and services of the city's utilities that are delivered or provided to the consumer."

At all times relevant to this dispute, the Code of Ordinances did not address whether the City of Lebanon could collect on undercharges incurred for services provided, but not billed, due to the City of Lebanon's clerical error. Section 910.04 provided for "bill adjustment action[s]" when a meter reading was not available, when a meter had failed to register, or when a meter had failed to register accurately. It authorized the City of Lebanon to estimate, then bill, the amount of services provided to the customer in those circumstances. However, § 910.04 is not applicable to this dispute because NIBCO's meter functioned properly and its actual electrical usage was known. No estimate is needed here.

NIBCO argues that it has no liability for the $1,269,933 undercharge because during the relevant time period Chapter 910 of the Code of Ordinances did not provide a means by which

the City of Lebanon could recoup undercharges caused by its own billing error.[1] NIBCO argues that Chapter 910 placed the risk of billing errors on the City of Lebanon in the absence of a faulty meter issue covered by § 910.04. NIBCO argues this is fair because the City of Lebanon had the duty to read the meter, compute the proper charge, and bill for all services rendered. Lebanon, Ohio Code of Ordinances §§ 910.03–910.05. Further, the City of Lebanon chose to use meter multipliers that its director testified that most customers do not understand.

The City of Lebanon, for its part, emphasizes that NIBCO does not contest that it was undercharged for electric services it consumed in the amount of $1,269,933. It contends that the fact that Chapter 910 was silent on the issue of recoupment of undercharges during the relevant time period does not mean that Chapter 910 *prohibited* billing for undercharges. In fact, *no* express language in Chapter 910 prohibited the City of Lebanon from collecting undercharges.

The City of Lebanon further argues that interpreting Chapter 910 to preclude it from collecting undercharges from customers for services actually consumed, but incorrectly billed due to a clerical error, would be an absurd result. "It is the duty of the court to construe the acts of legislative bodies so as to avoid unreasonable, absurd, or ridiculous consequences." *Lakewood Homes, Inc. v. Bd. of Adjustment of City of Lima*, 25 Ohio App. 2d 125, 267 N.E.2d 595, 602 (1971). The Sixth Circuit has stated that although the text of a statute is the starting point for statutory construction, "[r]eliance on the literal language of the statute is not justified . . . if it leads to an interpretation which is inconsistent with the legislative intent or to an absurd result." *Appleton v. First Nat. Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995). The Sixth Circuit further has explained that ambiguity can exist in a statute with clear language "if it

---

[1] The City of Lebanon revised its Code of Ordinances after this dispute began. It now provides, in relevant part, that "[U]ndercharges may be billed and the customer shall pay the charges for the entire period of inaccurate billing when that period is discernible, except undercharged [*sic*] billed to residential customers shall be limited to a maximum of 365 days." Lebanon, Ohio Code of Ordinances § 910.05(D)(2).

appears that the legislature did not consider a particular problem which a court is called upon to resolve." *Id.* (citation omitted). Thus, courts can look beyond the language of a statute or ordinance when the text is ambiguous or when unambiguous language leads to an absurd result. *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998).

The Court concludes that the City of Lebanon presents the stronger argument. The contract between the parties contains few provisions and provides simply that NIBCO will be "responsible for payment of all bills lawfully due with respect to [electric, water, sewer, and waste] services." (Doc. 1-5 at PageID 26.) The contract does not define whether undercharges can be included in bills that are lawfully due. Chapter 910, which is incorporated into the service contract by force of law, also did not address recoupment of undercharges caused by a billing error. Accordingly, the Court can look beyond the literal language of Chapter 910 given this particular ambiguity in the text, *Appleton*, 62 F.3d at 801, and conclude that the intent of the service contract is for the customer to pay all proper charges for electric services consumed.

Alternatively, the Court will not interpret Chapter 910 to prohibit the collection of undercharges caused by reasons other than meter reading errors because, again, such an interpretation would lead to an absurd result. *City of Akron v. Rogers Indus. Prods.*, No. 18227, 1997 WL 665719, at *2 (Ohio App. 9th Dist., Oct. 8, 1997) (agreeing with the city's argument that it would be "absurd" to interpret the utility contract as basing charges on erroneous bills rather than actual electric usage). As the court noted in the *Rogers Industrial Products* case, "billing errors by a public utility are foreseeable, and adjusted billing is a foreseeable method of correcting those errors." *Id.* at *3. This Court concludes that the City of Lebanon did not intend to forfeit its right to collect fees for actual electric service usage from a customer initially underbilled due to a clerical error.

The City of Lebanon concedes that PUCO regulations do not govern the municipal utility services. Nonetheless, to the extent that they provide persuasive authority on industry practice, it is worth noting that PUCO regulations authorize Ohio public utilities to collect undercharges caused by "billing problems" in installments over a period of time equal to that for which the service went underbilled, up to thirty-six months. Ohio Admin. Code § 4901:1-10-23(A). Also, pursuant to general municipal utility law, "[t]he only restraint imposed by law upon a municipality's proprietary undertaking of providing electrical energy is that the rates charged be reasonable *and that there be no unjust discrimination among the customers served*, taking into account their situation and classification." *Orr Felt Co. v. City of Piqua*, 2 Ohio St. 3d 166, 443 N.E.2d 521, 525 (1983) (internal quotation and citation omitted) (emphasis added). The Court agrees that if the City of Lebanon does not collect the undercharges from NIBCO, then its other customers effectively will have paid a discriminatorily higher rate for their electric service over that sixty-five month period. *See Cincinnati Gas & Elec. v. Joseph Chevrolet Co.*, 153 Ohio App. 3d 95, 791 N.E.2d 1016, 1023–24 (2003) (stating that if a utility is restricted from collecting undercharges, then the cost of the unbilled service is spread to the utility's other public customers).

For these reasons, the Court holds that the City of Lebanon is not precluded from recouping from NIBCO undercharges in the amount of $1,269,993 to be collected in monthly installments equal to the number of months NIBCO was underbilled. *See e.g.*, *Joseph Chevrolet Co.*, 791 N.E.2d 1018–24 (allowing a utility to collect for gas usage that went unmetered for a period of two years); *Rogers Indus. Prods.*, 1997 WL 665719, at *2–3 (holding that customer's refusal to pay for undercharged services amounted to a breach of contract); *Norman v. Pub. Utils. Comm'n of Ohio*, 62 Ohio St. 2d 345, 406 N.E.2d 492, 498 (1980) (allowing utility to

9

backbill for undercharges incurred over a period of more than one year); *Memphis Light, Gas & Water Div. v. Auburndale Sch. Sys.*, 705 S.W.2d 652 (Tenn. 1986) (holding that customer was liable to pay for all electricity consumed even when the municipal utility negligently underbilled the customer for a period of years); *but see City of Lawrenceville v. Ricoh Elecs., Inc.*, 174 F. App'x 491, 496 (11th Cir. 2006) (holding that the city was not entitled to backbill its customer for undercharges based on the state law account stated doctrine).

## IV. CONCLUSION

For the foregoing reasons, NIBCO's Motion for Summary Judgment (Doc. 17) is **DENIED** and the City of Lebanon's Motion for Summary Judgment (Doc. 19) is **GRANTED**.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court
